UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| | | |
|---|---|---|
| ABDULKARIM MUHAMMAD, | ) | CASE NO. 1:16-cv-2569 |
| | ) | |
| Muhammad, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Abdulkarim Muhammad, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ did not apply the correct legal standards, I recommend that the court should VACATE and REMAND the final decision of the Commissioner for further proceedings.

## II.      Procedural History

On September 12, 2013, Muhammad filed an application for supplemental security income[1] alleging disability beginning February 1, 2009. (Tr. 12, 179)  The claim was denied initially on December 2, 2013 (Tr. 120) and on reconsideration on March 13, 2014. (Tr. 130)  Muhammad filed a written request for a hearing on March 21, 2014. (Tr. 135)

---

[1] This was Muhammad's second application for disability benefits.  His first claim was filed on April 21, 2009 and denied on March 13, 2012.  (Tr. 68)

Administrative Law Judge ("ALJ") Penny Loucas heard the case on August 5, 2015. (Tr. 31-67) The ALJ found Muhammad not disabled in a September 11, 2015 decision. (Tr. 9-30) The Appeals Council denied Muhammad's request for review, rendering the ALJ's decision final. (Tr. 1-4) Muhammad instituted this action to challenge the Commissioner's final decision.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Muhammad was born on June 22, 1960 and was 55 years old at the time of the hearing. (Tr. 36) He was living in a house with his wife and his twelve year old daughter. (Tr. 42) Muhammed did not complete high school and has no work history. (Tr. 35)

### B.     Medical Evidence

#### 1. Evidence Related to Muhammad's Physical Limitations

Muhammad has a history of back pain. The medical evidence shows that Muhammad met with Dr. Osama Malak at the Comprehensive Pain Care Center, Inc., from September 2012 through May 2013. (Tr. 271-300) During this period, Muhammad reported varying degrees of lower back pain, neck pain and left shoulder pain. Muhammad told Dr. Malak that pain pills improved his pain but standing, sitting and bending aggravated it. (Tr. 271) Dr. Malak noted that Muhammad had not gone to physical therapy and instructed him that his back would not get better if he did not exercise. (Tr. 274) On October 25, 2012, Dr. Malak noted that Muhammad had lost 15 pounds and was exercising at home which had helped with his lower back pain. (Tr. 277) At the end of this period, Muhammad received an injection for the pain. (Tr. 291-295)

Muhammad was in a car accident on November 10, 2014 and met with Brian C. Studer, D.C. on November 19, 2014. (Tr. 581) Dr. Studer made many chiropractic adjustments to

Muhammad's back from November 2014 through June 2015. (Tr. 565-580) Dr. Studer prescribed a handicap placard because Muhammad's pain worsened with walking. (Tr. 587)

Muhammad began treating with Dr. George K. Mathew on November 29, 2014. (Tr. 682) Dr. Mathew diagnosed sprains in Muhammad's cervical, thoracic and lumbar regions, to his right shoulder, and to both of his knees. During appointments in December 2014, Dr. Mathew observed muscle spasms in Muhammad's cervical and lumbar regions. (Tr. 676-681) In January 2015, Muhammad reported a decrease in pain but continued to have a limited range of motion. Dr. Mathew ordered an MRI. (Tr. 675) The MRI showed posterior central and bilateral disc herniation at L5-S1 with marked foraminal stenosis, intraforaminal bilateral neural contact at L5, and foraminal stenosis at L2, L3 and L4. (Tr. 684)

Muhammad continued to treat with Dr. Mathew until August 3, 2015. Dr. Mathew observed moderate to mild spasms and tenderness in Muhammad's cervical and lumbar spinal regions. Dr. Mathew prescribed pain medication and recommended steroid injections. (Tr. 648-669) On May 26, 2015, he prescribed a walking cane and recommended that Muhammad continue using it throughout his treatment. (Tr. 496, 659, 667)

Muhammad met with Bharat Shah, M.D. a couple of times in June 2015 at the Comprehensive Pain Care Center, Inc. Muhammad reported no change in his lower back pain, but his cervical pain had increased. He reported pain in his left shoulder. Muhammad received a lumbar epidural steroid injection to treat his back pain on June 29, 2015. (Tr. 598-601)

Muhammad is obese and has diabetes and high blood pressure. From October 2013 through July 2015, Muhammad met with certified nurse practitioner Virginia B. Brugger eight or nine times for various reasons including checking his blood pressure and obtaining refills on his

hypertension and diabetes medications. (Tr. 384-389, 464-468, 490, 483, 638, 630, 633, 624-625, 617-621, 604-605)  Nurse Brugger also advised Muhammad on exercise and nutrition.

### 2. Evidence Related to Muhammad's Mental Limitations

Muhammad has had auditory hallucinations and been diagnosed with schizophrenia. Muhammad met with Dr. Achala Patel at the Nord Center for his mental condition from January 2013 through April 2015. (Tr. 305-308, 312, 314, 473, 479, 532, 543, 547, 555, 563)  Dr. Patel described Muhammad's symptoms as "voices, paranoia, anger, trouble in memory, insomnia" and diagnosed schizophrenia, unspecified. (Tr. 308, 532)  During appointments with Dr. Patel, Muhammad reported hearing voices.  Muhammad reported improvement with medication and found that, if he missed a day or two of his medication, he would hear voices.  (Tr. 305-308, 532, 543)  Dr. Patel noted that Muhammad was able to take care of his daughter, house, wife and dog and handle activities of daily living independently. (Tr. 308)

Muhammad also met with Matt Obenauer at the Nord Center from January 2013 through June 2015. (Tr. 322, 324, 326, 330, 332, 334, 336, 338, 340, 342, 344, 346, 348, 459-450, 475, 477, 481, 524, 534, 545, 549, 551, 553)  During his appointments with Mr. Obenauer, Muhammad reported auditory hallucinations, paranoia, and various sources of stress.  He also reported poor sleep. (Tr. 336)  Muhammad found that medication helped with his symptoms. His marriage and other personal relationships were not sources of conflict.

On October 29, 2013, Mr. Obenauer completed a questionnaire regarding Muhammad's daily activities. (Tr. 459-460)  Mr. Obenauer stated that Muhammad had good relationships with others except when he was experiencing an increase in symptoms.  He noted that Muhammad had poor relationships with his former employers and co-workers and was fired for his inability to get along with them.  Mr. Obenauer stated that Muhammad could drive, make simple meals, and maintain his grooming.  Muhammad relied on assistance from his girlfriend for cleaning,

shopping, banking and bill paying. Muhammad didn't have any hobbies. Mr. Obenauer reported

that Muhammad failed to keep many of his scheduled appointments and/or would present for

appointments on the wrong dates and times. (Tr. 459-460)

### C.     Opinion Evidence

#### 1.     Consultative Examiner – Thomas M. Evans, Ph.D. – May 28, 2009

Thomas Evans, Ph.D., performed a consultative exam of Muhammad on May 29, 2009.

(Tr. 508-513)  Dr. Evans diagnosed cognitive disorder, not otherwise specified, and psychotic

disorder, not otherwise specified.  Muhammad's IQ was scored at 42; however, Dr. Evans noted

that Muhammad put forth minimal effort during the testing and gave up easily.  Dr. Evans also

questioned Muhammad's effort because he was unable to recite two digits backward, which is

extremely rare.  Dr. Evans stated that malingering would need to be ruled out.  Dr. Evans opined

that Muhammad's ability to understand and follow simple repetitive directions was moderately

impaired, but markedly impaired with more complex directions; that his ability to handle stress

and pressure was moderately impaired; that he easily angered and tried to stay away from others;

that he had very limited coping resources; his ability to relate to others and deal with the general

public was moderately impaired; his insight and social judgment was poor, but he was able to

participate in routine daily household activities.  Dr. Evans did not think that Muhammad would

be able to manage his own benefits if he were awarded benefits given his sub-average

intelligence.  Dr. Evans assigned a GAF score of 45 for Muhammad's cognitive abilities and

psychotic symptoms and a GAF score of 50 for his functioning level.

#### 2.     Consultative Examiner – Ronald G. Smith, Ph.D. – October 14, 2010

Ronald G. Smith, Ph.D., performed a consultative exam of Muhammad on October 14,

2010. (Tr. 515-521)  Dr. Smith diagnosed major depressive disorder, severe, with psychotic

features, single episode, in partial treatment remission; and borderline intellectual functioning. Dr. Smith noted that Muhammad's condition had worsened after family members died and that he was spending much of his time talking to himself or having conversations with his deceased family members. Dr. Smith opined that Muhammad was markedly impaired in his ability to relate to others including co-workers, supervisors and the public in a work situation. He believed that Muhammad's mental ability to understand, remember and follow instructions was markedly impaired, as was his ability to maintain attention, concentration, and persistence in the performance of routine tasks. His mental ability to withstand the stress and pressure of day-to-day work was moderately impaired and Muhammad would need assistance in handling funds if they were awarded. Dr. Smith assigned a GAF score of 42. (Tr. 520)

### 3. Reviewing Psychologist – Jennifer Swain, Psy.D. – November 2013

On November 19, 2013, reviewing state agency psychologist, Jennifer Swain, found that Muhammad had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 98) Dr. Swain questioned Muhammad's credibility regarding certain issues in his record. For example, Muhammad reported auditory hallucinations but observation showed no evidence of hallucinations. She also questioned the credibility of his statement that he could walk no longer than 3-5 minutes. She found that evidence from Nord Counseling services was not consistent with the totality of the evidence. (Tr. 99)

### 4.    Reviewing Psychologist – Dr. Carl Tishler – March 2014

Reviewing state psychologist, Carl Tishler, Ph.D., reviewed Muhammad's file on March 7, 2014 and affirmed the findings of Dr. Swain. (Tr. 110)

### 5.    Reviewing Physician – Dr. Michael Delphia – November 2013

On November 20, 2013, state agency reviewing physician, Michael Delphia, M.D., reviewed Muhammad's file and found that Muhammad was able to occasionally lift and/or carry 50 pounds; was frequently able to lift and/or carry 25, pounds; could stand and/or walk for six hours in an eight hour workday; could sit about six hours in an eight hour workday; was unlimited in his ability to push and/or pull; and had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 100)

### 6.    Reviewing Physician – Dr. Steve E. McKee – March 2014

Reviewing state physician, Steve E. McKee, reviewed Muhammad's file on March 8, 2014 and affirmed the findings of Dr. Delphia. (Tr. 112)

### D.    Testimonial Evidence

### 1.    Muhammad's Testimony

Muhammad offered the following testimony at his ALJ hearing:

- Muhammad's date of birth was June 22, 1960 and he was 55 years old at the time of the hearing.(Tr. 36)

- Muhammad did not complete high school or obtain a GED. (Tr. 37)

- Muhammad had not worked for over 15 years. (Tr. 37)

- Approximately 15 years ago, Muhammad started hearing voices. He moved in with his mother and she took him to the Nord Center for treatment for his condition. (Tr. 38)

- Muhammad had never lived alone. He lived with his mother until she died, seven or eight years before the hearing. Muhammad inherited his mother's house. At the time

of the hearing, he was living in the house with his wife and twelve year old daughter. (Tr. 41-43)

- Muhammad spent most of his time sitting in his garage to avoid being around other people. (Tr. 44)

- Muhammad did not think he would be able to work because he didn't like to be around people; he felt like they were laughing at him; and could not maintain concentration. (Tr. 45)

- Muhammad also had lower back pain and was using a cane for walking. (Tr. 46)

### 2. Vocational Expert – Paula Zinsmeister

Paula Zinsmeister, a vocational expert ("VE"), also testified. (Tr. 50-65)

- She was asked to consider a hypothetical individual of Muhammad's age, education, and past work experience who could perform a full range of work at any exertional level, but was limited to simple routine repetitive tasks. (Tr. 50-51)

- Ms. Zinsmeister testified that this individual would be able to perform the jobs of industrial cleaner or laundry worker and there were significant numbers of those jobs in the national and state economy. (Tr. 51)

- When the hypothetical individual was limited to medium exertion and simple, routine, repetitive tasks, Ms. Zinsmeister believed he would still be able to perform those jobs. (Tr. 51)

- If the hypothetical individual were off task 10% of the time, in addition to his normal breaks, he would still be able to perform a job. (Tr. 51) The VE testified that most employers would tolerate an employee being off task up to 15%, but over 15% would not be tolerated and no positions would be available to him. (Tr. 64) She also testified that one unexcused absence would be tolerated per month. (Tr. 52)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

[2] "[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy. *Id.*

**V.      The ALJ's Decision**

The ALJ's September 11, 2015 decision stated:

1.  Mr. Muhammad had not engaged in substantial gainful activity since
    September 12, 2013.  (Tr. 14)

2.  Muhammad had the following severe impairments: diabetes mellitus,
    degenerative disc disease, obesity, and borderline intellectual functioning.
    (Tr. 14)

3.  Muhammad did not have an impairment or combination of impairments that
    met or medically equaled the severity of one of the listed impairments.  (Tr. 14)

4.  Muhammad had the residual functional capacity to perform medium work
    except that he was limited to simple, routine, repetitive tasks.  (Tr. 17)

5.  Muhammad had no past relevant work.  (Tr. 25)

6.  Muhammad was born on May 22, 1960.  When his application was filed, he
    was 53 years old.  (Tr. 25)

7.  Muhammad had a limited education and was able to communicate in English. (Tr. 25)

8.  Transferability of job skills was not material because Muhammad did not have
    any past relevant work.  (Tr. 25)

9.  Considering Muhammad's age, education, work experience, and residual
    functional capacity, there were jobs that existed in significant numbers in the
    national economy that he could perform.  (Tr. 25)

In short, the ALJ determined that Mr. Muhammad had not been under a disability since September

12, 2013. (Tr. 26)

**VI.     Law & Analysis**

**A.      Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

      The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

      The court must also determine whether proper legal standards were applied. If not,

reversal is required unless the legal error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572

F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006)

("Even if supported by substantial evidence, however, a decision of the Commissioner will not

be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B.     ALJ's Assessment of Medical Evidence

Muhammad argues that the ALJ committed legal error by failing to evaluate the medical evidence according to the Agency's rules and regulations.  Muhammad argues the ALJ made three specific errors: 1) she failed to identify Dr. Mathew as a treating physician and, therefore, failed to properly evaluate his medical findings; 2) she failed to consider an MRI taken in January 2015; and 3) she failed to properly evaluate the opinions and findings of Dr. Studer, Muhammad's chiropractor.

20 C.F.R. § 416.920 states that the agency will "consider all evidence in your case record when [making] a determination or decision whether you are disabled."  An ALJ must include a discussion of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A); *Reynolds v.*

*Comm'r of Soc. Sec.,* 424 Fed. Appx. 411, 414 (6th Cir. 2011). "The reasons requirement is both

a procedural and substantive requirement, necessary in order to facilitate effective and

meaningful judicial review." *Reynolds,* 424 Fed. Appx. at 414.

Dr. George K. Mathew treated Muhammad from November 2014 through August 2015.

(Tr. 648 -685)  During this treatment, Dr. Mathew observed muscle spasms and noted tenderness

and decreased range of motion.  Dr. Mathew initially diagnosed acute strains to Muhammad's

cervical, thoracic and lumbar regions and to his right knee and right shoulder. (Tr. 680)  In

January 2015, Dr. Mathew ordered an MRI which resulted in a finding of a posterior central and

bilateral disc herniation with marked foraminal stenosis and intraforaminal bilateral L5 neural

contact as well as foraminal stenosis at L2, L3, and L4. (Tr. 684)

The ALJ's decision does not mention Dr. Mathew by name.  However, she references his

records (B17F) in the following paragraph:

> The claimant's treatment notes also include treatment from chiropractors.  While
> chiropractors are not acceptable medical sources for establishing an impairment,
> they are considered in other respects.  The chiropractor did find some positive
> symptoms such as intermittent decreased range of motion, spasms, and
> tenderness, however, the chiropractor generally did not rate the claimant's
> symptoms beyond mild or moderate and diagnosed the claimant with sprains and
> strains.  (Ex. B14F; B17F).  The undersigned did note however, that *no physicians
> reported* the claimant had any indication of muscle spasms or decreased range of
> motion of spinal segments after performing physical examinations upon the
> claimant.  Therefore, the chiropractors' findings were wholly out of sync with the
> findings of other physicians which decreased the value given.

(Tr. 19, emphasis added)  As Muhammad points out and defendant concedes, Dr. Mathew was

not a chiropractor.  And given that the ALJ based her rejection of his records partly on the fact

that he was a chiropractor and partly on the fact that no physician agreed with his findings, her

reasons did not build an accurate and logical bridge between the evidence and her conclusions.

Thus, the ALJ failed to provide an accurate reason for discounting the findings in Dr. Mathew's records.

The ALJ also failed to accurately explain her evaluation of the objective findings from the MRI ordered by Dr. Mathew in January 2015.  Regarding the MRI report, the ALJ stated, "[t]he claimant reported that his low back pain got better after he got a[n] epidural steroid injection in his spine.  The claimant had varying degrees of foraminal stenosis from L2-S1 and neural contact at L5 (Ex. B14F/32)."  Exhibit B14F/32 is a copy of the imaging report but, other than referring to the foraminal stenosis revealed in this exhibit, the ALJ did not discuss the MRI or even include all of its findings in her statement (e.g. "L5-S1 Posterior central and bilateral disc herniation with marked [foraminal] stenosis with [intraforaminal] bilateral L5 neural contact") The next paragraph of the ALJ's decision stated that "the claimant had examinations which revealed normal functioning or his neck, back, and extremities with a recent completely normal physical examination, with no complaints of back pain, occurring in February 2015."  In support, she cited exhibits: B8F/4 – a medical record from April 2014 which documented chronic low back pain (Tr. 487); B4F – medical records from 2012-13 documenting chronic low back pain (Tr. 384); B6F – a medical record from December 2013 documenting chronic low back pain (Tr. 464); and B16F – a medical record from July 2015 which documented low back pain. (Tr. 605).  All but one of these records predated a car accident that Muhammad claimed exacerbated his low back pain.  Moreover, these medical records appear to document visits primarily monitoring Muhammad's high blood pressure and diabetes.  Thus, it is not surprising that they barely mention Muhammad's back pain.  Nonetheless, each of the records referred to by the ALJ actually documented low back pain, contradicting her finding that "claimant often reported no joint or back pain of any kind to providers."   The ALJ did not build an accurate and

logical bridge between the evidence and her finding that Muhammad wasn't reporting back pain. Nor did she explain why she attached little or no significance to the MRI imaging report, a part of the evidence she was required to consider. 20 C.F.R. § 416.920.

Muhammad's final complaint regarding the ALJ's treatment of the medical evidence is that she failed to properly evaluate the medical evidence from Chiropractor Studer.  Muhammad does not dispute that Dr. Studer should be considered an "other medical source."  As such, he is not entitled to the controlling weight reserved for "acceptable medical sources."  However, as recently noted by this court, "the ALJ must consider all of the available evidence in the individual's case record, including information from "other medical sources." *Williams v. Colvin,* 2017 U.S. Dist. LEXIS 41384 at *7 (N.D. Ohio 2017), citing *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 378 (6th Cir. 2013).

SSR 06-03P, 2006 SSR LEXIS 5, **15-16, provides:

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

Given this guidance, "it will rarely be enough for the commissioner to silently 'consider' the above-mentioned factors in deciding how much weight to give to an 'other source' who has seen the claimant in the source's professional capacity." *Williams v. Colvin,* 2017 U.S. Dist.

LEXIS 41384 at *9-10, citing *Estep v. Comm'r of Soc. Sec.*, 2016 U.S. Dist. LEXIS 42060, 2016 WL 1242360, at *3 (E.D. Mich. Mar. 30, 2016). Rather, "[t]he Sixth Circuit has repeatedly recognized that the commissioner must make an adequate record of the commissioner's consideration of an 'other source' who has seen the claimant in the source's professional capacity." *Estep*, 2016 U.S. Dist. LEXIS 42060, 2016 WL 1242360, at *3 (collecting cases); *Duderstadt v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 96142, 2014 WL 3508897, at *11 (S.D. Ohio July 15, 2014) (recommending remand where the "ALJ's decision neither consider[ed] nor mention[ed] the supportability or consistency of the opinion provided by [the claimant's therapist] and [did] not refer to any other regulatory factor as a ground for rejecting his opinions"), adopted by 2014 U.S. Dist. LEXIS 138516, 2014 WL 4829498 (S.D. Ohio Sept. 29, 2014. The ALJ complies with the regulations when she addresses the opinion [from an 'other source'] and gives reasons for crediting or not crediting the opinion. *Drain v. Comm'r of Soc. Sec.*, No. 14-cv-12036, 2015 U.S. Dist. LEXIS 99221, 2015 WL 4603038, at *4 (E.D. Mich. July 30, 2015) (citing *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)).

Here, the ALJ considered Dr. Studer's records in the same paragraph she considered Dr. Mathew's records stating:

> The claimant's treatment notes also include treatment from chiropractors. While chiropractors are not acceptable medical sources for establishing an impairment, they are considered in other respects. The chiropractor did find some positive symptoms such as intermittent decreased range of motion, spasms, and tenderness, however, the chiropractor generally did not rate the claimant's symptoms beyond mild or moderate and diagnosed the claimant with sprains and strains. (Ex. B14F; B17F). The undersigned did note however, that no physicians reported the claimant had any indication of muscle spasms or decreased range of motion of spinal segments after performing physical examinations upon the claimant. Therefore, the chiropractors' findings were wholly out of sync with the findings of other physicians which decreased the value given.

(Tr. 19)   The ALJ did not completely ignore Dr. Studer's records.  But her reason for discounting them was inaccurate.  Dr. Mathew was not a chiropractor, but a physician.  Thus, there *were* reports from physicians confirming the findings of Dr. Studer.  Because the reasons given for discrediting Dr. Studer's findings were inaccurate, the ALJ failed to build an accurate and logical bridge between the evidence and her result.

Dr. Studer did not provide a medical opinion, and even if he had, the ALJ was not required to assign controlling weight to it.  However, the ALJ's reasons for discounting Dr. Studer's findings are not supported by substantial evidence in the record.  The inaccuracies in the decision suggest that the ALJ failed to properly assess Dr. Studer's records and this cannot be said to be merely harmless error.  Dr. Studer's findings actually were consistent with the findings of Dr. Mathew, a treating source.  The ALJ might have properly rejected Dr. Studer's and Dr. Mathew's findings for different reasons.  However, because the ALJ did not articulate any other reasons, I am unable to determine whether there was a proper basis for rejecting their findings. *See Gayheart,* 710 F.3d at 378-379.  I recommends that this case be remanded so that the ALJ can properly evaluate the Muhammad's medical evidence.

## C.      Outdated Evidence/Credibility

Muhammad also argues that the ALJ erred in relying on evidence from his initial application[3] when assessing his credibility.  Muhammad cites no case law, nor is the undersigned aware of any, precluding an ALJ from considering evidence from prior claims when assessing a claimant's credibility.  Nonetheless, Muhammad argues that most of the evidence upon which the ALJ relied was irrelevant to the Muhammad's current claim.  The ALJ determined that she

---

[3] As previously noted, Muhammad's first claim was filed on April 21, 2009 and denied on March 13, 2012.  (Tr. 68)

was not bound by the prior ALJ's decision because there was new and material evidence. (Tr. 12) Muhammad contends that the ALJ should have relied only on the new evidence when assessing his credibility.

It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The consistency of the various items of information contained in the record must be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id*.

Social Security Ruling 96-7p also requires the ALJ to explain her credibility determinations in her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight." *Id*. In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.*

The ALJ determined that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, she found the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms to be not entirely credible. (Tr. 18) The ALJ supported her credibility assessment by citing records revealing that the claimant exhibited non-compliance (by failing to go to physical therapy and nutrition counseling) and by taking his mother's prescribed pain medication. (Tr. 19) She also reasoned that Muhammad had not exhausted conservative treatment options for his back pain. She felt that the records showed only intermittent use of narcotics, three epidural steroid injections, and no evidence that he had attended physical therapy. She noted that he had not used a TENS unit or had any medial branch blocks or injections performed on his cervical spine. (Tr. 19) The ALJ also noted that Muhammad got a prescription for a cane. But she determined that Muhammad's medical records consistently exhibited a normal gait with no gait disturbances. She even suggested that the doctor may have given Muhammad a cane because he felt "subtle pressure to help," because the evidence did not support the need for a cane for ambulating. (Tr.19)

The undersigned is aware that credibility assessments are for the ALJ and not the court. I also note that Muhammad's second application for benefits asserts the same disability onset date as his first application (February 1, 2009). Thus, the court cannot agree with Muhammad that the older medical records cited by the ALJ are all irrelevant to her credibility assessment.

However, as with the other portions of the ALJ's decision, her credibility assessment contains inaccuracies that call into question her conclusions.

Dr. Mathew prescribed a cane for Muhammad on May 26, 2015. (Tr. 496)  The ALJ found that Muhammad did not need a cane for ambulation (Tr. 19), citing exhibits: B1F/7, 19, B4F/5, 11, 17, 23, B11F/5, B16F/5, 24, 30, 37.  With the exception of B16F/5 (a record documenting a visit to monitor Muhammad's high blood pressure, diabetes and coughing), all of the cited records pre-dated Dr. Mathew's cane prescription.  Some of the records are considerably older and reflect treatments before the 2010 car accident which Muhammad claims aggravated his back pain.  Consequently, it is questionable whether these records actually support the ALJ's finding that Muhammad did not require the cane.  Given the deference afforded to an ALJ's credibility assessment, the undersigned would not recommend remand on this basis.  However, should the court accept my recommendation to remand the case, the ALJ should provide a more accurate explanation in support of her credibility assessment.

### D.      Residual Functional Capacity

The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c).  The regulations require the ALJ to evaluate several factors in determining the RFC, including all medical evidence (not limited to medical opinion testimony) and the claimant's testimony. See *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS  18644, *7 (N.D. Ohio, March 1, 2010) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).  Although the Commissioner must determine

Muhammad's residual functional capacity, she is required to follow the regulations requiring her to consider the medical evidence, including the medical opinions in the record.

In this case, the ALJ's evaluation of the findings of Dr. Mathew and Dr. Studer did not comply with the regulations. Muhammad also argues that the ALJ failed to properly consider Muhammad's schizophrenia and to include any of the symptom manifestations in the RFC and hypothetical question. The ALJ did not list schizophrenia or auditory hallucinations as severe impairments. I have recommended that the court remand this case so that the ALJ can properly evaluate the medical evidence. Upon remand, the ALJ must reexamine Muhammad's residual functional capacity with proper regard for all of the medical evidence and the findings of the physician and chiropractor who cared for Muhammad.

**E.      The ALJ's Failure to Identify Other Jobs Muhammad Could Perform**

Muhammad contends that the ALJ failed to identify other jobs in the national economy that he could perform. The Commissioner argues that the ALJ's failure to identify jobs that Muhammad could perform was harmless error because the VE clearly identified other jobs during Muhammad's administrative hearing.

The ALJ's decision stated:

> * * * To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as aaaaaa.

(Tr. 26) This is another error in the ALJ's decision. She did not actually list the jobs identified by the VE during the hearing. Nevertheless, it is likely that this typographical error was harmless given that the VE testified that there were many other jobs that the hypothetical

individual could perform.  (Tr. 51); *See Wilson v. Astrue,* 2008 U.S. Dist. LEXIS 5351 at *4

(E.D. Ky. Jan. 23, 2008*); Dekruger v. Comm'r of Soc. Sec.,* 2009 U.S. Dist. LEXIS 20145 at *12

(E.D. Mich. Mar. 9, 2009).  Because I have recommended that the court remand this case so that

the ALJ may properly evaluate the medical evidence, the ALJ should correct her decision by

properly identifying jobs that Muhammad can perform in the national economy.

## VII.    Recommendation

Because the ALJ did not apply the correctly apply the applicable legal standards and

because the ALJ's reasoning did not build an accurate and logical bridge between the evidence

and the results of her decision, I recommend that the final decision of the Commissioner be

VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for

further proceedings consistent with this Report and Recommendation.


Dated: October 10, 2017

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**